# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| **MICHAEL SEXTON,** )<br>Plaintiff ) <br> )<br>v. )<br> )<br>**KILOLO KIJAKAZI,**[1] )<br>**Acting Commissioner of Social** )<br>**Security,** )<br>Defendant ) | Civil Action No. 2:21cv00011<br><br>**REPORT AND**<br>**RECOMMENDATION**<br><br>By: Pamela Meade Sargent<br>    United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Michael Sexton, ("Sexton"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Sexton protectively filed his application for DIB on August 31, 2018, alleging disability as of August 31, 2018,[2] based on anxiety, depression and fibromyalgia. (Record, ("R."), at 10, 194.) The claim was denied initially and upon reconsideration. (R. at 86-88, 93-96, 98-100.) Sexton then requested a hearing before an administrative law judge, ("ALJ"). (R. at 101-02.) The ALJ held a hearing on August 18, 2020, at which Sexton was represented by counsel. (R. at 35-54.)

By decision dated August 27, 2020, the ALJ denied Sexton's claim. (R. at 10-24.) The ALJ found Sexton meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2023. (R. at 12.) The ALJ found Sexton had not engaged in substantial gainful activity since November 9, 2018, the alleged onset date.[3] (R. at 12.) The ALJ determined that Sexton had severe impairments, fibromyalgia, dysfunction of major joints and obesity, but he found Sexton did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13, 16.)

---

[2] Sexton subsequently amended his onset date to November 9, 2018, the date he stopped working. (R. at 10, 43.)

[3] Therefore, Sexton must show he was disabled between November 9, 2018, the alleged onset date, and August 27, 2020, the date of the ALJ's decision, to be eligible for benefits.

The ALJ found that Sexton had the residual functional capacity to perform light work,[4] except he could lift or carry items weighing 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; stand and/or walk four hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; occasionally climb, balance, stoop, kneel, crouch and crawl; and occasionally work at unprotected heights and in humidity, wetness, extreme cold and extreme heat. (R. at 17.) The ALJ found that Sexton was unable to perform his past relevant work. (R. at 22.) Based on Sexton's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Sexton could perform, including the jobs of a cashier II, a ticket seller and a checker. (R. at 22-23, 50-51.) Thus, the ALJ concluded Sexton was not under a disability as defined by the Act from November 9, 2018, the alleged onset date, through August 27, 2020, the date of the decision, and he was not eligible for DIB benefits. (R. at 24.) *See* 20 C.F.R. § 404.1520(g) (2021).

After the ALJ issued his decision, Sexton pursued his administrative appeals, (R. at 146), but the Appeals Council denied his request for review. (R. at 1-5.) Sexton then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2021). This case is before this court on Sexton's motion for summary judgment filed June 28, 2021, and the Commissioner's motion for summary judgment filed July 16, 2021.

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2021).

*II. Facts*

Sexton was born in 1967, (R. at 22), which, at the time of the ALJ's decision, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). He has a high school education and past work experience as a machine operator/compressor assembler at Bristol Compressors. (R. at 42-43, 49, 195.) Sexton testified he stopped working on November 9, 2018, when the plant where he was working closed. (R. at 43.)

In rendering his decision, the ALJ reviewed records from Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Dr. William Rutherford M.D., a state agency physician; Mountain View Regional Medical Center, ("Mountain View"); Veterans Affairs Hospital, ("VA"); and Southern Medical Group.

By way of background, in September 2015, Sexton underwent a mental health examination at the request of his primary care physician due to complaints of depression.[5] (R. at 470.) Sexton reported he had been doing "alright" and denied any prior mental health treatment. (R. at 470.) Medication was prescribed by his primary care physician, but Sexton refused to take it. (R. at 471.) Sexton denied any disturbances in his mood, such as depression or anxiety, as well as symptoms indicative of a generalized anxiety disorder, an obsessive-compulsive disorder, a social phobia and a panic disorder. (R. at 471.) Examination revealed Sexton had a smooth and steady gait; he was cooperative with appropriate eye contact; he was fully oriented; his mood was generally euthymic; his affect was broad and congruent; his speech was spontaneous and of normal rate, rhythm and volume; his thought

---

[5] Sexton did not seek mental health treatment again until September 2019. (R. at 637-46.)

processes were logical and goal-directed; his recent, remote and immediate recall were intact; and his insight and judgment were intact. (R. at 475-76.) It was noted that Sexton did not meet the diagnostic criteria for any mental illness and no outpatient care was recommended. (R. at 476.)

In 2016, Sexton had a 40 percent disability rating from the VA for fibromyalgia. (R. at 317.) After complaining of bilateral knee pain, x-rays of Sexton's knees were performed on August 19, 2016, which revealed no significant medial or lateral compartment narrowing; sclerosis along the lateral patellar facet, suggestive of some underlying degenerative change, possible chondromalacia; and small suprapatellar joint effusion. (R. at 288-89.) The x-ray of the right knee also revealed minimal tri-compartment osteophyte formation. (R. at 288-89.)

On March 30, 2018, Sexton saw Dr. Souhail G. Shamiyeh, M.D., a physician with the VA, and Sexton voiced no new complaints, stating he had been "doing well." (R. at 332.) He reported he had been diagnosed with fibromyalgia, but he was not able to see a rheumatologist. (R. at 332.) Dr. Shamiyeh noted that Flexeril and Cymbalta seemed to help Sexton's fibromyalgia. (R. at 332.) Although a review of systems revealed edema of the feet because Sexton was on his feet a lot at work, he was doing better with support hose. (R. at 333.) Sexton denied any anxiety and depression but reported joint pain. (R. at 333.) Examination revealed Sexton had a normal gait but crepitation in both knees; he had small ganglion cysts on his right index finger; he had no evidence of synovitis or joint swelling; his cranial nerves were intact; he was fully oriented; and his mood and affect were normal. (R. at 334.) Dr. Shamiyeh questioned whether Sexton's bilateral knee pain was due to degenerative joint disease. (R. at 335.)

On March 19, 2019,[6] Sexton presented to the emergency department at Mountain View for complaints of right rib pain after he fell and hit his chest on a piece of machinery five days earlier. (R. at 489-493.) Chest x-rays revealed no cardiopulmonary abnormalities or fractures, and Sexton was able to take deep breaths without difficulty. (R. at 491, 493.) Sexton was diagnosed with right rib contusion. (R. at 491.)

On April 13, 2019, Dr. Eddie Brown, D.O., a physician with Southern Medical Group, Inc., saw Sexton at the request of Disability Determination Services. (R. at 499-503.) Sexton alleged disability due to anxiety, depression, fibromyalgia and back and knee pain. (R. at 499.) Sexton was independent with his activities of daily living. (R. at 499.) Sexton was in no acute distress; he had a normal gait and ambulated without assistance; his respiratory excursions were full and symmetrical without use of accessory muscles; he had no rales, rhonchi, wheeze or rubs; his grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally; his extremities had no edema, cyanosis or erythema; he was able to sit in no significant distress and walk and stand in the office; he was fully oriented and cooperative; he did not appear to be depressed or anxious; he was able to communicate with no deficits; his recent and remote memory were intact; he had good insight and cognitive function; he had good bilateral motor tone and strength in all muscle groups; his reflexes were normal; he had intact sensation; he had no muscle asymmetry, atrophy or involuntary movements; his straight leg raising tests were negative; and he had some joint tenderness in the lumbar spine and bilateral knees, but no signs of joint instability, inflammation or deformity. (R. at 500-01.)

---

[6] Sexton did not seek treatment after his alleged onset date until March 19, 2019.

Dr. Brown opined that Sexton "likely" had degenerative disc disease of the lumbar spine and "likely" had osteoarthritis in both knees. (R. at 501.)

Dr. Brown opined Sexton would "unlikely" be able to walk and/or stand for a full workday; he "may be" able to sit for a partial workday with allotted occasional breaks; he would be limited to lifting and carrying items weighing less than 10 pounds because his condition "may be" exacerbated by lifting or carrying excessive weight; and he should refrain from excessive bending, stooping and crouching. (R. at 501.)

On May 1, 2019, x-rays of Sexton's lumbar spine were unremarkable. (R. at 509.)

On May 8, 2019, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating Sexton's mental impairments were non-severe because he did not have a mental medically determinable impairment. (R. at 64.)

On May 8, 2019, Dr. Robert McGuffin, M.D., a state agency physician, completed a medical assessment, indicating Sexton had the residual functional capacity to perform light work, except he could stand, walk and sit six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; frequently climb ramps and stairs; occasionally climb ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl; and he should avoid concentrated exposure to temperature extremes and humidity. (R. at 66-68.) Dr. McGuffin opined Sexton had no manipulative, visual or communicative limitations. (R. at 67.) On July 10, 2019,

Dr. William Rutherford M.D., a state agency physician, completed a medical assessment, which mirrored that of Dr. McGuffin from May 8, 2019. (R. at 78-80.)

On June 5, 2019, Sexton saw Dr. Shamiyeh and reported left hip and leg problems. (R. at 530.) He stated his left leg went numb if he sat or stood too long. (R. at 530.) Sexton also requested a mental health evaluation. (R. at 530.) Examination revealed a normal gait but crepitation in both knees; he had no evidence of synovitis or joint swelling; his straight leg raising tests were negative; he had decreased sensation over the anterior and lateral aspect of the left thigh but good peripheral pulses and symmetrical deep tendon reflexes; he had excoriations on both arms and legs; he was fully oriented; and his mood and affect were normal. (R. at 533.) Dr. Shamiyeh ordered a nerve conduction study for Sexton's complaints of leg numbness, but there is no evidence this study was performed. (R. at 533.) He also recommended a mental health appointment due to Sexton's complaints of anxiety and depression. (R. at 533.)

On June 7, 2019, Sexton had an eye examination, which revealed suspected bilateral open angle borderline glaucoma, low risk and farsightedness. (R. at 523, 526.) On June 18, 2019, a hearing evaluation was performed after Sexton complained of hearing loss. (R. at 516-17.) He was found to be a candidate for bilateral hearing amplification and was provided with hearing aids. (R. at 518.)

On August 14, 2019, to help Sexton obtain a handicapped licensed plate, Dr. Shamiyeh completed a Certification of Disability form for the Virginia Department of Motor Vehicles, indicating that Sexton was "permanently and totally disabled" due to fibromyalgia. (R. at 591.)

On September 11, 2019, Sexton saw Kermit Dugger, D.N.P., a psychiatric and family nurse practitioner with the VA, for complaints of depression and anxiety. (R. at 637.) Sexton stated he was first diagnosed with anxiety and depression three or four years earlier and he had been prescribed Cymbalta, which had been helpful. (R. at 637.) Sexton had a euthymic, but anxious mood; his speech was normal; his thought processes were intact; his insight and judgment were good; he was fully oriented; he exhibited no deficits in attention and concentration; and he had intact memory. (R. at 642.) Dugger diagnosed mild, recurrent, major depressive disorder. (R. at 644.)

On October 3, 2019, Kristen Hosey, Ph.D., a staff psychologist with the VA, saw Sexton for complaints of depression due to grief following the death of his brother the year before. (R. at 634-35.) He reported increased tearfulness and a loss of interest in activities he previously enjoyed with his brother, such as hunting, fishing and golfing. (R. at 635.) Sexton reported he experienced anxiety when in large groups of people. (R. at 635.) His patient health questionnaires revealed only mild depression symptoms and mild to moderate anxiety symptoms. (R. at 636.) Sexton had normal eye contact and speech; his attention, concentration and memory were intact; his thought processes were clear; his mood was dysthymic with a congruent affect; and his insight and judgment were adequate. (R. at 636.) Hosey diagnosed mild, recurrent, major depressive disorder. (R. at 636.)

On October 24, 2019, a patient health questionnaire was suggestive of mild depression. (R. at 627-28.) Hosey reported Sexton had normal eye contact and goal-directed speech; his attention, concentration and memory were intact; his thought processes were clear; his mood was dysthymic and his mood congruent; and his insight and judgment were adequate. (R. at 628.) Sexton's treatment goals were to

increase time with hobbies such as fishing, hunting and golfing; spending time with family; and increasing friendships. (R. at 629.) On November 18, 2019, Sexton reported he was "doing alright" and that "his mood was doing well." (R. at 619-20.) He stated that outdoor activities, such as hunting, golfing, camping and fishing relieved his symptoms. (R. at 620.) Sexton was pleasant and cooperative; he was fully oriented; his speech was fluent, spontaneous with regular rate, volume and rhythm; his mood was self-described as "doing good;" his affect was congruent; his thought processes were logical, linear and goal-directed; and his insight, judgment, memory and concentration were intact. (R. at 621-22.) On November 20, 2019, a patient health questionnaire was suggestive of no depression. (R. at 617-18.) Again, Sexton had normal eye contact and goal-directed speech; his attention, concentration and memory were intact; his thought processes were clear; his mood was dysthymic with a congruent affect; and his insight and judgment were adequate. (R. at 618.)

On December 16, 2019, Sexton returned to Dr. Shamiyeh complaining of a rash on his arms which he attributed to anxiety, but otherwise he had no complaints. (R. at 608-09.) He reported he was seeing a mental health provider who prescribed medication for his anxiety but stated he had not recently taken it. (R. at 609.) Sexton stated the medication relieved his itching. (R. at 609.) He denied any problems with hip or back pain; however, he reported his left leg went numb if he sat or stood too long, but this condition had been ongoing with no change. (R. at 609.) He reported Flexeril and Cymbalta helped his fibromyalgia symptoms. (R. at 609.) Examination revealed a normal gait, but Sexton had venous insufficiency changes with trace ankle edema on the left; his neurological examination was intact; he had excoriations on both forearms; he was fully oriented; and his mood and affect were normal. (R. at 611-12.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2021). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Sexton argues the ALJ's decision is not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-12.) Sexton argues the ALJ erred by improperly determining his residual functional capacity by rejecting Dr. Brown's opinion. (Plaintiff's Brief at 7-9.) Sexton contends that, if the ALJ accepted Dr. Brown's exertional limitations, he would be found disabled pursuant to Rule 201.6 of the Medical Vocational Rules, ("the Grids"). (Plaintiff's Brief at 7.) Sexton also argue the ALJ failed to find he suffered from a severe mental impairment. (Plaintiff's Brief at 9-11.)

Because this matter involves a claim filed after March 27, 2017, a new regulatory framework applies to the ALJ's evaluation of medical opinions in the record. For applications filed on or after March 27, 2017, the Social Security Administration, ("SSA"), has enacted substantial revisions to the regulations governing the evaluation of opinion evidence. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)). Under the new regulations, ALJs no longer are required to assign an evidentiary weight to medical opinions or to accord special deference to treating source opinions. *See* 20 C.F.R. § 404.1520c(a) (2021) (providing that ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any

medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources").[7]

Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case record based on the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5) (2021) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. § 404.1520c(b)(1) (2021).

In evaluating the persuasiveness of an opinion or finding, the SSA deems supportability and consistency "the most important factors," and, thus, the ALJ must address those two factors in evaluating the persuasiveness of medical opinions or prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2) (2021).[8] In evaluating the supportability of a medical opinion, "[t]he more relevant the objective

---

[7] The new regulations define a "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to perform the physical, mental or other demands of work activity or to adapt to environmental conditions 20 C.F.R. § 404.1513(a)(2) (2021). Those regulations also define a "prior administrative medical finding" as a "finding, other than the ultimate determination about whether [a claimant is] disabled, about a medical issue made by [the SSA's] Federal and State agency medical and psychological consultants at a prior level of review." 20 C.F.R. § 404.1513(a)(5) (2021).

[8] "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 404.1520c(c)(2).

Pageid#: 733

medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) … the more persuasive the medical opinions … will be." 20 C.F.R. § 404.1520c(c)(1). In assessing the consistency factor, "[t]he more consistent a medical opinion(s) … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) … will be." 20 C.F.R. § 404.1520c(c)(2).

The new regulations also alter the way the ALJ discusses the medical opinions or findings in the text of the decision. *See* 20 C.F.R. § 404.1520c(b)(2). After considering the relevant factors, the ALJ is not required to explain how he considered each of them. Instead, when articulating his finding about whether an opinion is persuasive, the ALJ need only explain how he considered "the most important factors" of supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). The ALJ may comment on the other factors, including the source's relationship with the claimant, but generally has no obligation to do so. *See* 20 C.F.R. § 404.1520c(b)(2)-(3) (2021).

When the ALJ finds two or more opinions or findings about the same issue are both equally well-supported and consistent with the record, but are not exactly the same, the ALJ must consider the most persuasive factors, including the nature and extent of the medical source's relationship with the claimant and area of specialization, as well as the catch-all "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 404.1520c(b)(3), (c)(3)-(5).

A claimant's residual functional capacity refers to the most the claimant can still do despite his limitations. *See* 20 C.F.R. § 404.1545(a) (2021). The ALJ found

that Sexton had the residual functional capacity to perform light work, except he could lift or carry items weighing 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday; stand and/or walk four hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; occasionally climb, balance, stoop, kneel, crouch and crawl; and occasionally work at unprotected heights and in humidity, wetness, extreme cold and extreme heat. (R. at 17.)

Sexton argues the ALJ erred by not giving more weight to Dr. Brown's opinion. (Plaintiff's Brief at 6-9.) Dr. Brown opined Sexton would "unlikely" be able to walk and/or stand for a full workday; he "may be" able to sit for a partial workday with allotted occasional breaks; he would be limited to lifting and carrying items weighing less than 10 pounds because his condition "may be" exacerbated by lifting or carrying excessive weight; and he should refrain from excessive bending, stooping and crouching. (R. at 501.) The ALJ found Dr. Brown's opinion unpersuasive because it was vague and did not provide clear limitations. (R. at 20.) The ALJ noted Dr. Brown did not clarify how many hours in an eight-hour workday Sexton would be able to walk and stand. (R. at 20.) The ALJ further found Dr. Brown did not define what he meant by "excessive" bending, stooping and crouching. (R. at 20.) Dr. Brown found Sexton had "obvious signs of joint tenderness" in the lumbar spine and both knees, but Dr. Brown's examination revealed Sexton no joint instability, inflammation or deformity. (R. at 501.)

The ALJ noted that Dr. Brown's examination findings failed to support his opinion that Sexton was limited in sitting, standing or walking since Sexton had a normal gait, negative straight leg raising tests, no muscle asymmetry, atrophy or involuntary movements. (R. at 18, 20, 500-01.) Despite Sexton's diagnosis of fibromyalgia, Dr. Brown documented that his examination revealed no tender or

trigger points. (R. at 501.) Likewise, in contrast to his opinion that Sexton could only lift "less than ten pounds," Dr. Brown's examination revealed good bilateral motor tone and strength in all muscle groups and his grip strength was 5/5 with adequate fine motor movements, dexterity and ability to grasp objects, bilaterally. (R. at 501.) Dr. Brown's vague opinion lacked support from his detailed and generally normal examination findings. *See* 20 C.F.R. § 404.1520c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.").

The ALJ found the opinions of the state agency physicians persuasive and consistent with the medical evidence of record. (R. at 19.) The state agency physicians found Sexton could perform light work, except he could stand, walk and sit six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; frequently climb ramps and stairs; occasionally climb ladders, ropes and scaffolds, balance, stoop, kneel, crouch and crawl; and he should avoid concentrated exposure to temperature extremes and humidity. (R. at 66-68, 78-80.) In May 2019, x-rays of Sexton's lumbar spine were unremarkable. (R. at 509.) Dr. Shamiyeh regularly reported that Sexton had a normal gait but crepitation in both knees; he had no evidence of synovitis or joint swelling; his straight leg raising tests were negative; and, although he had decreased sensation over the anterior and lateral aspect of the left thigh, he had good peripheral pulses and symmetrical deep tendon reflexes (R. at 334, 533.) In addition, as noted above, Dr. Brown's examination findings were generally normal.

The ALJ also noted Sexton did not have any emergency department visits, hospitalizations, surgeries, injections or physical therapy for his conditions and Sexton reported his conditions were controlled with medication. (R. at 19, 332, 609.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

Sexton argues that the ALJ erred by failing to find that he suffered from a severe mental impairment. (Plaintiff's Brief at 9-11.) The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1522(a) (2021). Basic work-related mental activities include understanding, remembering and carrying out simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1522(b) (2021). Although the Social Security regulations do not define the term "significant," this court previously has held that it must give the word its commonly accepted meanings, among which are, "having a meaning" and "deserving to be considered." *Townsend v. Heckler*, 581 F. Supp. 157, 159 (W.D. Va. 1983). In *Townsend*, the court also noted that the antonym of "significant" is "meaningless." 581 F. Supp. at 159.

In evaluating the severity of mental impairments, the ALJ must first determine the degree of functional loss in four areas considered essential to the ability to work: (1) understanding, remembering or applying information; (2) interacting with others; (3) the ability to concentrate, persist or maintain pace; and (4) adapting or managing oneself. *See* 20 C.F.R. § 404.1520a(c)(3) (2021). These areas are rated on the following five-point scale: none, mild, moderate, marked and extreme. *See* 20 C.F.R.

§ 404.1520a(c)(4) (2021). The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. *See* 20 C.F.R. § 404.1520a(c)(4). If a claimant's degree of limitation in all of these areas is rated as "none" or "mild," the Commissioner generally will find that the claimant's impairment is not "severe" unless the evidence otherwise indicates that there is more than a minimal limitation in the ability to do basic work activities. *See* 20 C.F.R. § 404.1520a(d)(1) (2021).

Here, the ALJ found Sexton had no to mild limitations in all four areas. (R. at 13-15.) As the ALJ's decision details, Sexton's mental examinations routinely showed that he was fully oriented and cooperative; he was able to communicate with no deficits; his recent and remote memory were intact; he had good insight and cognitive function; his mood and affect were normal; his thought processes were intact; he exhibited no deficits in attention and concentration. (R. at 334, 501, 533, 618, 622, 628, 636, 644.) Sexton reported that his "mood was doing well and outdoor activities, such as hunting, golfing, camping and fishing relieved his symptoms. (R. at 620.) In addition, Sexton reported Cymbalta helped his symptoms of anxiety and depression. (R. at 637.) *See Gross,* 785 F.2d at 1166.

Based on my findings regarding Sexton's residual functional capacity finding, I will not address his remaining argument that he would be found disabled pursuant to Rule 201.6 of the Grids.

For all the above-stated reasons, I find substantial evidence exists to support the ALJ's consideration of the opinion evidence, as well as his resulting residual functional capacity finding and ultimate finding that Sexton was not disabled and not entitled to DIB benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's finding that Sexton did not suffer from a severe mental impairment;

2. Substantial evidence exists in the record to support the ALJ's consideration of the opinion evidence;

3. Substantial evidence exists in the record to support the ALJ's finding regarding Sexton's residual functional capacity; and

4. Substantial evidence exists in the record to support the Commissioner's finding that Sexton was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Sexton's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo

determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:   June 23, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE